IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

SUPER WINGS INTERNATIONAL,
LTD.,

        Plaintiff,

vs.

JODY L. KEENER,

        Defendant.

J. LLOYD INTERNATIONAL, INC.,

        Intervenor Plaintiff,

vs.

SUPER WINGS INTERNATIONAL,
LTD.,

        Intervenor Defendant.

No. C09-0115

ORDER FOR JUDGMENT

TABLE OF CONTENTS

I.     *INTRODUCTION* ........................................ 2

II.   *PROCEDURAL HISTORY* ................................ 2

III.  *RELEVANT FACTS* ..................................... 3
     A.   *The Parties* ...................................... 3
     B.   *Early Relationship* ............................... 4
     C.   *The Agreement* ................................... 4
     D.   *Promissory Note* ................................. 5
     E.   *Release of Molds and Tooling* .................... 5
     F.   *Remaining Molds and Tooling* .................... 6
     G.   *Written Demands By Counsel* ..................... 9

IV.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

  A.    Super Wings' Claim Against Keener . . . . . . . . . . . . . . . . . . . . 13

        1.    Parol Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.    Consideration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        3.    Release of Molds and Tooling . . . . . . . . . . . . . . . . . . . 19

        4.    Attorney Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

  B.    JLI's Claim Against Super Wings . . . . . . . . . . . . . . . . . . . . . 23

  C.    Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V.   ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## I. INTRODUCTION

On the 19th day of December, 2011, this matter came on for trial on the First Amended Complaint (docket number 18) filed by the Plaintiff, Super Wings International, Ltd. ("Super Wings"), and the Petition of Intervention (docket number 20) filed by the Intervenor, J. Lloyd International, Inc. ("JLI"). The trial was concluded on December 20, 2011.

Super Wings was represented by its director, Tim Yip, and its attorneys, Mark Roberts and Dawn Gibson. Defendant Jody L. Keener appeared personally and on behalf of JLI, and was represented by attorneys Michael Lahammer and Robert Wilson.

## II. PROCEDURAL HISTORY

On August 18, 2009, Super Wings filed a complaint seeking judgment against Keener for breach of contract. Keener filed an answer on September 8, 2009.

On January 15, 2010, JLI filed an application to intervene in the action, seeking judgment against Super Wings. The application was granted and the petition of intervention was filed on February 18, 2010. Super Wings answered the intervention petition on July 29, 2010.

Meanwhile, Super Wings filed its first amended complaint on February 10, 2010, with Keener filing an answer to the amended complaint on February 23, 2010.

On August 6, 2010, Super Wings filed a motion for summary judgment, asking that judgment be summarily entered against Keener. On September 6, 2010, JLI filed a motion for summary judgment, asking that judgment be entered against Super Wings on JLI's claim. Both motions for summary judgment were denied by Judge Edward J. McManus on June 6, 2011.

On August 2, 2011, with the consent of all parties, the action was referred to the undersigned magistrate judge for all further proceedings, pursuant to 28 U.S.C. § 636(c). The matter was then scheduled for trial to the Court on December 19, 2011.

## III. RELEVANT FACTS

### A. The Parties

Super Wings is a trading company located in Hong Kong. Tim Yip, its owner and director, testified that Super Wings has been in business since 2000. It currently has approximately ten employees. Super Wings is a marketing company which receives purchase orders from customers and then contacts a factory in China to manufacture the product. Super Wings also markets toys manufactured in various factories.

Super Wings does not manufacture toys, nor does it own molds or tooling for the manufacture of toys.[1] Apparently, however, Yip owns factories which manufacture toys and other products. That is, Super Wings – which is owned by Yip – contracts with other companies – some of which are also owned by Yip – for the manufacture of the products.

JLI is also a wholesaler and marketer of toys. Jody Keener, who testified that he has been in the toy business for 43 years, started JLI in 1984. Originally, JLI was a toy distributor, but it almost immediately became involved in the manufacture of toys. For the most part, Keener has been the sole owner of JLI. Between 2006 and 2008, however, Wai Har Yip, also known as Dora Yip, owned 50 percent of JLI. Dora Yip is Tim Yip's older

---

[1] Molds and tooling are used to manufacture the parts necessary to build toys. For purposes of this case, the terms are interchangeable. They include both plastic molds and die cast molds. They vary greatly in size, from a few hundred pounds to several thousand pounds.

sister. For convenience, and to avoid confusion, the Court will refer to Wai Har Yip as Dora Yip.

### B. Early Relationship

Tim Yip and Keener met at a trade show in the mid-1990s. At that time, Yip was associated with a company called Toy Zone. Toy Zone was a wholesaler and marketing company. Yip's initial dealings with Keener and JLI involved the sale of products through Toy Zone. In 2006, JLI purchased the assets of Toy Zone, including various molds and tooling. It was apparently at about that time that Dora Yip became a 50% owner of JLI. Keener testified that the molds and tooling purchased from Toy Zone are reflected on Defendant's Exhibit T.

Yip testified that Super Wings initially started doing business with JLI "indirectly" in 2003. Keener estimated it was 2003 or 2004. Beginning in 2006, Super Wings supplied products directly to Keener and JLI. According to Yip, Super Wings was paid only a small portion of the amount owed by JLI for the products purchased between 2006 and 2008. Keener testified that in 2008, he "wanted to get out of the relationship" with Super Wings. Dora's ownership interest in JLI was also apparently terminated at about that time.

### C. The Agreement

In order to resolve the dispute between Super Wings and JLI, the parties entered into an agreement on December 30, 2008. *See* Plaintiff's Exhibit 1. The Agreement states that JLI owes Super Wings "the sum of $4,512,000.00 for manufacturing various toys, molds and other processes." The Agreement also states that Super Wings is "in possession of certain molds and tooling" owned by JLI, and notes that Dora Yip and Keener "are equal shareholders" of JLI. The Agreement was entered into "in compromise and resolution of disputes that have arisen" in regard to the debt owed to Super Wings and the molds and tooling owned by JLI.

The parties agreed that the $4,512,000 owed by JLI would be repaid to Super Wings by the execution of two promissory notes. Keener promised to pay $2 million and

Dora Yip promised to pay $2,512,000. The promissory notes were executed contemporaneously with the Agreement, and were attached to the Agreement as Exhibits A and B. "[I]n exchange for entering into the promissory notes," Super Wings released and discharged any amounts Keener or JLI may have otherwise owed Super Wings.

The Agreement further provided, "for the promises made and in consideration of the above," that the molds and tooling set forth in Exhibit C (attached to the Agreement), and other unidentified molds and tooling in Super Wings' possession, were the property of JLI. Super Wings further "agree[d] to release the molds and tooling to a party authorized by [JLI] to receive same." Super Wings also released any liens or other interests in the molds and tooling "in consideration of Keener and [Dora] Yip signing the promissory notes as set forth in Exhibits A and B." Super Wings also agreed to "complete all work in progress."

### D. Promissory Note

Contemporaneously with the execution of the Agreement, Keener signed a promissory note, attached to the Agreement as Exhibit A. Keener agreed to pay Super Wings the sum of $2 million, with interest from December 30, 2008, at the rate of 5%. According to the amortization schedule attached to the promissory note, Keener was required to make six monthly "interest only" payments, followed by eighteen monthly payments of principal and interest.

It is undisputed that Keener paid the first six interest-only payments of $8,333.33 per month. *See* Plaintiff's Exhibit 4. Keener did not make the $115,561.07 monthly payment due on July 1, 2009, however, nor has he paid any amount since that time. Keener testified that he "intentionally stopped paying" because Super Wings had not released the molds and tooling.

### E. Release of Molds and Tooling

When the Agreement was executed on December 30, 2008, there was "work in progress" on a submarine toy. The production was completed and shipped to JLI in the

United States by the end of July 2009. At JLI's request, the molds and tooling associated with the submarine toy were also shipped to the United States at that time. Defendant's Exhibit G reflects that the submarine molds were "shipped direct to J Lloyd Int" on July 24, 2009. JLI paid for the shipping.

At JLI's direction, additional molds and tooling in Super Wings' possession were picked up by a company called Woo Hing, for delivery to Woo Hing's factory in China. Tom Tong, a representative of Woo Hing, testified that molds used to manufacture slot cars were picked up from a Chinese factory designated by Super Wings. According to Mr. Tong, the first pickup (requiring three or four trips) occurred in March 2009, with a second pickup in July or August of the same year. Defendant's Exhibit G appears to be a list of the molds and other items picked up by Woo Hing on July 20, 2009.[2] Mr. Tong testified that he was provided with a list of the items which Woo Hing was supposed to pick up. It is customary to have such a list, according to Mr. Tong, "otherwise we don't know what we are going to pick up." Similarly, Yip testified that the workers at the factories where the molds were stored were given written authorization by JLI to release the molds to Woo Hing.

### F. Remaining Molds and Tooling

Yip concedes that a substantial number of molds and tooling remain under Super Wings' control. Specifically, the molds and tooling associated with Exhibit C (attached to the Agreement) remain in Super Wings' possession or control, together with additional molds and tooling referred to, but not specifically identified, in the Agreement. Keener estimated that there are 15,000 molds or tools remaining in Super Wings' possession, representing 800 different toys. They are located either at one of Yip's factories or in

---

[2] Keener testified initially that Exhibit G identifies molds that were returned to the United States. A review of the exhibit suggests, however, that only the submarine molds were shipped to JLI, with the remaining molds picked up by Woo Hing on another date. On cross-examination, Keener conceded that the items shown on Exhibit G were picked up by Woo Hing.

warehouses. According to Yip, the molds and tooling are not being used, and Super Wings has no interest in continuing to store them. Yip testified that he has asked JLI repeatedly to pick them up.

Keener testified that he has requested the molds and toolings from Super Wings "since day 1." According to Keener, his requests were made to Tim Yip, Dora Yip, and Yoko, a woman working in Super Wings' office. Keener testified that in January 2009, just after the Agreement was executed, he "sent an e-mail to Yoko to release everything" to Woo Hing. However, a copy of the e-mail was not produced at the time of trial. In fact, Keener did not produce any exhibits at the trial, representing written demands for the return of the molds and tooling, until after JLI's application to intervene was filed on January 15, 2010. Keener testified he contacted Super Wings "probably a hundred" times to ask to pick up the molds and tooling, but he offered no phone records, copies of emails, letters, or other documentation to support his claim.

Keener testified that he was particularly interested in obtaining the molds and tooling associated with the toys identified by Exhibit C of the Agreement. These are "hard body" toys purchased from Toy Zone, to be marketed under the brand name Tootsietoy. Defendant's Exhibit T is an untitled eight-page document which, according to Keener, is a list of the Toy Zone molds and tooling which were purchased by JLI in 2006. The record is silent regarding who prepared Exhibit T, but the face of the document suggests it was sent to Dora Yip, with a copy to Tim Yip. Handwriting on the exhibit suggests that Dora Yip then forwarded the list to Jody Keener. Yip admitted that at least a portion of the molds and tooling listed on Exhibit T were part of the Agreement, and remain in Super Wings' possession.

Defendant's Exhibit J is a list of molds and tooling purchased by JLI from Alpha International, and then transferred to Super Wings. The exhibit was prepared by Kevin Albers, an employee of JLI, who, according to Keener, "kept very good records." While

7

the record is imprecise, the molds and tooling listed on Exhibit J apparently remain in Super Wings' possession and are part of the agreement.

Defendant's Exhibit U, consisting of 209 pages, identifies tools which were transferred from Strombecker HK Ltd., which is owned by JLI, to Super Wings. According to Keener, JLI bought the tools "basically for scrap" and they were delivered to Super Wings. Apparently, they remain in Super Wings' possession. Also, Defendant's Exhibit V is a one-page list of tools belonging to JLI, but remaining in Super Wings' possession.

Additional molds owned by JLI, but remaining in Super Wings' possession, are listed on Defendant's Exhibit M. The first four items – relating to Mr. Bubbles – are not part of this lawsuit, and the last five items – relating to a transparent horse and transparent dinosaur – have been returned to JLI. The remaining items listed on Exhibit M apparently remain, however, in Super Wings' possession.

According to Keener, one of his "priorities" was retrieving the molds and tooling relating to the Buddy "L" Railway Express, which is a die cast electric train manufactured for JLI by Super Wings. Keener testified that JLI had a licensing agreement with Coca Cola, for the sale of an electric train bearing the Coca Cola brand. According to Keener, the licensing agreement required a $300,000 guarantee, which JLI was required to pay because it was unable to retrieve the molds and produce the product. The three-year agreement was purportedly signed in 2007 or 2008, and included other products which JLI was able to produce in the United States. Keener testified that JLI had "prebooked sales," and lost millions in profits when it was unable to manufacture and market the train. JLI did not produce the agreement with Coca Cola, documents reflecting its prebooked sales, evidence regarding a payment to Coca Cola for the licensing guarantee, or any other document supporting Keener's allegations.

Keener was unable to produce a comprehensive list of the molds and tooling in Super Wings' possession. Keener testified initially that there was a list of "about 400

pages," identifying most of the molds and tooling included in the Agreement. Keener later testified that the list was "no less than 300 pages." Keener described the list as a "stack" of two and one-half to three inches. That is, Keener apparently possessed a hard-copy list of the molds and tooling included in the Agreement. Keener did not testify regarding the current whereabouts of that list. Instead, Keener testified that electronic versions of the list were on two computers used by Dora Yip and her secretary at JLI's office in Cedar Rapids. According to Keener, Dora was "in and out" of the Cedar Rapids office for several months after the Agreement was signed on December 31, 2008. Apparently, however, Keener never asked for the list and, according to Keener, both computers were subsequently sent by one of JLI's employees to Dora in California. When asked whether he had attempted to retrieve the list, Keener responded "yes," but offered no details, and offered no documentation that he ever sought the return of the list, either orally or in writing. According to Keener, the list took about five years to compile and cost "over $1,000,000 in labor."

Yip testified repeatedly that the molds and tooling were not returned to JLI because JLI never produced a list of the specific molds and tooling being requested. Keener testified that he was never asked to provide a detailed list of the items to be released to a third party, but conceded that it would be "customary" for the party picking up the tools to sign a receipt for the specific items retrieved.

## G. Written Demands By Counsel

On July 6, 2009, Super Wings' solicitors in Hong Kong sent a letter to Keener, noting that Keener had failed to pay the $115,561.07 payment due on July 1, 2009.[3] Super Wings demanded payment in the full amount of $2 million, plus interest at the rate

---

[3] *See* Letter from Cham & Co. to Jody L. Keener, dated July 6, 2009 (Plaintiff's Exhibit 5).

of 9% from July 1, 2009.[4] On July 30, 2009, Super Wings' Iowa counsel sent Keener a similar letter, noting that he was "in default in payment of $115,561.07 as of July 1, 2009."[5] The letter demanded payment not later than August 10, 2009. The record is silent regarding any response, and Super Wings filed the instant action on the promissory note on August 18, 2009.

On January 15, 2010, JLI filed an application to intervene. On February 23, 2010, Super Wings' attorney wrote to JLI's attorneys, stating that he was "preparing a response" to JLI's petition for intervention, including JLI's claim that Super Wings refused to release and ship the molds and tooling in its possession. Among other things, the letter states:

> If you are aware of any instance in which [JLI] has directed the release of molds and/or tooling to an authorized recipient that Super Wings *has not* honored, please advise me immediately and Super Wings will arrange for release of those items.

Letter from Mark A. Roberts to Robert Wilson and Mike Lahammer, dated February 23, 2010 (Plaintiff's Exhibit 8).

The letter was sent by fax, and Keener's attorney responded the same day. Mr. Wilson does not respond directly to Mr. Roberts' letter, but asserts that "about 4% of the tools were released and that is all."[6] Mr. Roberts replied the same day, stating

---

[4] The promissory note executed by Keener provided that "[u]pon default in payment of any interest, or any installment of principal, the whole amount then unpaid shall become immediately due and payable at the option of the holder without notice," plus interest at the rate of 9% per annum. *See* Promissory Note (Exhibit 2).

[5] *See* Letter from Scott M. Brennan to Jody L. Keener, dated July 30, 2009 (Plaintiff's Exhibit 3).

[6] *See* Letter from Robert F. Wilson to Mark A. Roberts, dated February 23, 2010 (Plaintiff's Exhibit 9).

again that "if there were items that were not released that [JLI] wants released, Super Wings needs to know so it can release them."[7]

Two days later, Mr. Wilson responded by suggesting that Mr. Roberts' first letter stated that "they have shipped everything."[8] Mr. Wilson asserts that the second letter suggests "they do not know where to ship," and therefore concludes that "[o]bviously, one of these letters is incorrect."[9] The letter further states:

> Mr. Keener advised me that there has been shipped approximately 4% of the total tools. He told the representatives of Super Wings where to ship the items. They are to ship them to the same place that they shipped the 4%. Super Wings has been told that on numerous occasions.
>
> Mr. Keener was not at his office at the time I talked to him so he was unable to provide the exact details of when and where the shipments were to be made and were not made.

Letter from Robert F. Wilson to Mark A. Roberts, dated February 25, 2010 (Plaintiff's Exhibit 11).

On March 15, 2010, Mr. Roberts responded to Mr. Wilson's letter, suggesting that Keener was not "serious" about the return of the molds and tooling:

> Instead of identifying to whom the items may be released, you are playing games. That signals to me that JLI doesn't want the items very badly. If JLI was even faintly serious about wanting the release of these items, there should be no problem identifying that party. By the same token, if your JLI was even faintly serious about these supposed prior demands to release the items, you would have no trouble providing me those communications. It's perfectly clear JLI and Keener are

---

[7] *See* Letter from Mark A. Roberts to Robert Wilson and Mike Lahammer, dated February 23, 2010 (Plaintiff's Exhibit 10).

[8] *See* Letter from Robert F. Wilson to Mark A. Roberts, dated February 25, 2010 (Plaintiff's Exhibit 11).

[9] *Id.*

> simply using the tools and molds as an excuse to delay this matter.
>
> To avoid any further confusion, JLI should provide a written authorization signed by Mr. Keener listing the person to whom Super Wings is authorized to release the items. Super Wings is not obligated to pay shipping costs. Your clients can arrange to have the items picked up. To facilitate this release, I have prepared the simple form attached.
>
> Super Wings has asked me to assure JLI that it has not and is not holding the tools or molds as leverage for payment. *If JLI wants these items, it merely needs to tell us what to release and to whom.* Alternatively, JLI, Keener and Super Wings can establish an escrow agent to accept the tools and the payment from Keener.

Letter from Mark A. Roberts to Robert Wilson and Mike Lahammer, dated March 15, 2010 (Plaintiff's Exhibit 12). (emphasis added)

Three days later, Mr. Wilson sent a letter to Mr. Roberts, complaining that some of the molds and tools which were previously "sent" to Woo Hing were "broken and unuseable."[10] At his deposition on June 14, 2010, Keener signed the "AUTHORIZATION FOR RELEASE OF TOOLS AND MOLDS" provided by Mr. Roberts as an attachment to his March 15, 2010 letter. The authorization states: "WOO HING TO BE GIVEN ALL TOOLS AGAIN AND TO BE TRANSFERRED ASAP."[11]

On November 1, 2010, Mr. Wilson wrote to Mr. Roberts and requested that Super Wings release to JLI "all die cast tooling and all trade tooling that is being held by you."[12]

---

[10] *See* Letter from Robert F. Wilson to Mark A. Roberts, dated March 18, 2010 (Defendant's Exhibit F).

[11] *See* Plaintiff's Exhibit 7 (emphasis in original).

[12] *See* Letter from Robert F. Wilson to Mark A. Roberts, dated November 1, 2010
(continued...)

According to the letter, JLI "has a buyer that is interested in buying these, but must have the tools immediately." The record is silent regarding any response. No evidence was offered at trial regarding the purported buyer.

## IV. DISCUSSION

### A. Super Wings' Claim Against Keener

In its first amended complaint, Super Wings seeks judgment against Keener in the amount of $2 million, plus interest at the rate of 9% per annum from and after July 1, 2009, and attorney fees. Keener asks that the amended complaint be dismissed, asserting the promissory note "had no consideration" because "Super Wings failed to return the tools to J Lloyd International in consideration for the Note between Super Wings and Jody L. Keener."[13]

It is undisputed that on December 30, 2008, Keener signed a promissory note, agreeing to pay Super Wings the sum of $2 million, plus interest. Keener made six monthly "interest only" payments, pursuant to the amortization schedule, but did not make the monthly payment due on July 1, 2009, nor pay any amount since that time. Super Wings argues that the promissory note is an unconditional promise to pay, independent of any dispute regarding whether Super Wings released all of the molds and tooling to JLI. Keener argues that the promissory note is "invalid" because Super Wings has not released the molds and tooling as required under the Agreement.

The parties stipulated in the final pretrial order that "[t]he promissory note Keener signed is a negotiable instrument under Iowa Code § 554.3104 (2008) and, more specifically a 'note.' Iowa Code § 554.3104(5) (2008)."[14] Accordingly, enforcement of

---

[12](...continued)
(Defendant's Exhibit E).

[13] *See* Keener's Answer to First Amended Complaint (docket number 21) at 3.

[14] *See* Final Pretrial Order (docket number 63), ¶ 21 at 5.

the note is governed by Article 3 of the Uniform Commercial Code (codified at Iowa Code § 554.3101 *et seq.*).

A negotiable instrument issued without consideration is unenforceable.[15] "Consideration" for Article 3 purposes is defined in section 554.3303(2) as "any consideration sufficient to support a simple contract." In addition, an instrument[16] issued for "value," as defined in section 554.3303(1), is also issued for consideration. *Id.* If the consideration is a promise of performance, then failure to perform is a defense.

> The drawer or maker of an instrument has a defense if the instrument is issued without consideration. If an instrument is issued for promise of performance, the issuer has a defense to the extent performance of the promise is due and the promise has not been performed.

Iowa Code § 554.3303(2).

### 1. Parol Evidence

Super Wings first argues that because a negotiable instrument – by definition – is "an unconditional promise" to pay, Keener may not rely in his defense on any of the provisions found in the Agreement executed by the parties on December 30, 2008. Super Wings notes that the promissory note "does not refer to any outside document, save an

---

[15] More than 90 years ago, the Iowa Supreme Court stated:

> The general principle of the law of contracts, that to be valid and legally enforceable as between the parties thereto an agreement or undertaking of any kind must be supported by a consideration, is too elementary to call for citation of authorities. *To that rule commercial paper affords no exception.*

*State Sav. Bank of Logan v. Osborn*, 188 Iowa 168, 175 N.W. 964, 966 (1920) (emphasis added).

[16] For Article 3 purposes, an "instrument" means a negotiable instrument. *See* Iowa Code § 554.3104(2).

attached amortization schedule"[17] and, in fact, states that "[n]o other terms or oral promises not contained in this written contract may be legally enforced."[18] While parol evidence is generally inadmissible to vary, contradict, or add terms to an agreement, the Iowa Supreme Court has held that evidence may be admitted to prove a lack of consideration.

> There is nothing in the Negotiable Instruments Act (Acts 29th Gen. Assem. c. 130), or in the familiar rule against parol evidence to vary the terms or legal effect of a writing, which, as between the original parties, precludes plea or proof of no consideration or failure of consideration.

*State Sav. Bank of Logan v. Osborn*, 188 Iowa 168, 175 N.W. 964, 966 (1920). *See also Cooley v. Will*, 212 Iowa 701, 237 N.W. 315, 317 (1931) ("As only the original parties to the instruments are involved, it was permissible for appellee to show by parol evidence that the same were executed by her without consideration."). Therefore, Keener may introduce parol evidence in support of his claim that the promissory note lacked consideration.

Super Wings argues further, however, that the integration clause found on the promissory note precludes the use of parol evidence. The effect of an integration clause which states "that a writing is intended to be the complete and exclusive statement of the terms of the agreement or that the agreement is not subject to conditions is left to the supplementary law of the jurisdiction."[19] Thus, Iowa law governs regarding whether the integration language found on the promissory note precludes Keener's reliance on the Agreement. In *I.G.L. Racquet Club v. Midstates Builders, Inc.*, 323 N.W.2d 214 (Iowa 1982), the Iowa Supreme Court found that the trial court erred in prohibiting the introduction of parol evidence, notwithstanding integration clauses contained in the written

---

[17] *See* Super Wings' Post-Trial Brief (docket number 68) at 6.

[18] *See* Promissory Note (Exhibit 2).

[19] *See* UCC § 3-117, Official Comment 2.

15

contract. While the parol evidence rule forbids the use of extrinsic evidence to vary, add to, or subtract from a written agreement, it is admissible if it "sheds light on the situation of the parties, antecedent negotiations, attendant circumstances, and the objects the parties were striving to obtain." *Id.* at 216 (quoting *Hamilton v. Wosepka*, 261 Iowa 299, 154 N.W.2d 164, 168 (1967)). *See also C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 85 (Iowa 2011). The Court concludes that the integration clause found in the promissory note does not prevent Keener from offering evidence that the note lacked consideration.

### 2. *Consideration*

Keener asserts that he is not obligated to pay pursuant to the promissory note because it "had no consideration." To determine whether there is a "want of consideration" or a "failure of consideration" in this case, it is appropriate to examine the Agreement entered into between the parties on December 30, 2008. After identifying the participating parties, the Agreement recognizes that (1) JLI owes Super Wings $4,512,000, (2) Super Wings is in possession of molds and tooling owned by JLI, and (3) Dora Yip and Keener are equal shareholders of JLI. The Agreement then states that "the parties have entered into this agreement in compromise and resolution of disputes that have arisen" regarding the debt owed to Super Wings and the molds and tooling owned by JLI.

The Agreement consists of 11 numbered paragraphs. For these purposes, the Court focuses on the first four paragraphs: Paragraph 1 states that Super Wings agrees to "compromise the amount due and owing to them" with promissory notes executed by Keener and Dora Yip. Paragraph 2 states that "in exchange for entering into the promissory notes," Super Wings "does release and forever discharge" JLI and Keener from any causes of action, debts, or other claims which Super Wings may otherwise have against JLI and Keener. Paragraph 3 states that "for the promises made and in consideration of the above," Super Wings acknowledges that certain molds and tooling are the property of JLI. Paragraph 4 states that Super Wings agrees "to release the molds and

tooling to a party authorized by [JLI] to receive same" and – following a semi-colon – Super Wings also releases any liens or security interests which it may otherwise have in the molds and tooling "in consideration of Keener and [Dora] Yip signing the promissory notes as set forth in Exhibits A and B."

The Court notes preliminarily that the *Agreement* is supported by consideration because it was entered into "in compromise and resolution of disputes that have arisen" between the parties. The issue raised by Keener is whether the *promissory note* "had no consideration." In paragraph 1, Super Wings agrees to "compromise the amount due and owing" in exchange for promissory notes issued by Keener and Dora Yip. A negotiable instrument is issued for value and consideration when it is given as payment for a prior claim. *See* Iowa Code § 554.3303(1)(c) ("An instrument is issued or transferred for value if . . . the instrument is issued or transferred as payment of, or as security for, an antecedent claim against any person, whether or not the claim is due."). Thus, consideration for Keener's promissory note is provided by Super Wings' agreement to accept the note in exchange for the preexisting debt owed by JLI. Further consideration is provided in paragraph 2 of the Agreement, where Super Wings agrees to release JLI and Keener from any other causes of action, debts, or other claims. Furthermore, in paragraph 3, Super Wings agrees – "for the promises made and in consideration of the above" – that the molds and tooling set forth in Exhibit C to the Agreement, and other molds and tooling not specifically listed, are owned by JLI. In other words, pursuant to paragraphs 1, 2, and 3 of the Agreement, consideration for Keener's promissory note is provided by Super Wings (1) accepting the note in satisfaction of an antecedent debt, (2) releasing any other claims against JLI and Keener, and (3) agreeing that the molds and tooling belong to JLI.

This case is complicated, however, by the language found in paragraph 4 of the Agreement. The paragraph is a single sentence, divided into two parts by a semi-colon. In the first clause, Super Wings agrees to "release the molds and tooling" to a party authorized by JLI. In the second clause, Super Wings releases any liens or security

interests in the molds and tooling "in consideration of Keener and [Dora] Yip signing the promissory notes as set forth in Exhibits A and B." Accordingly, it is clear that Super Wings releasing any liens or security interests was part of the consideration for Keener signing the promissory note. What is less clear is whether Super Wings releasing the molds and tooling themselves was intended as consideration for the note.

While one could argue that only the release of liens or security interests in the molds and tooling – as opposed to the release of the molds and tooling themselves – was given by Super Wings "in consideration of Keener and [Dora] Yip signing the promissory notes as set forth in Exhibits A and B," such a narrow reading of paragraph 4 seems adverse to "the objects the parties were striving to obtain." It seems incongruous that Super Wings would agree that JLI owns the molds and tooling and agree to release any liens on the molds and tooling in consideration of Keener signing the promissory note, but *not* agree to release the molds and tooling themselves as part of the consideration given. Accordingly, the Court concludes that when paragraphs 1 through 4 of the Agreement are read as a whole, it appears that in consideration for Keener signing the promissory note, Super Wings agreed (1) to "compromise the amount due and owing to them," (2) to "release and forever discharge" any other causes of action, debts, or other claims which it may have held against JLI and Keener, (3) that the molds and tooling belonged to JLI, (4) to release the molds and tooling, and (5) to release any liens or security interests on the molds and tooling.

Keener asserts that the fourth item given "in consideration of Keener and [Dora] Yip signing the promissory notes" has not been met. That is, Keener asserts that Super Wings has not "released" the molds and tooling. An instrument issued in exchange for a promise of performance is supported by value and consideration. *See* Iowa Code § 554.3303(1)(a) ("An instrument is issued or transferred for value if . . . the instrument is issued or transferred for a promise of performance, to the extent the promise has been performed."). However, "[i]f an instrument is issued for a promise of performance, the

issuer has a defense to the extent performance of the promise is due and the promise has not been performed." Iowa Code § 554.3303(2). Here, as part of the consideration for Keener signing the promissory note, Super Wings promised to release the molds and tooling. Accordingly, the Court concludes that if Keener proves that Super Wings failed to perform its promise to release the molds and tooling, then he has established a defense of "no consideration."

### 3.    Release of Molds and Tooling

As set forth above, the Court concludes that part of the consideration for Keener signing the promissory note was Super Wings' agreement to release the molds and tooling. If Super Wings failed to meet its obligation in that regard, then the promissory note lacked full consideration. Accordingly, the Court must determine whether Keener has proved that Super Wings failed to release the molds and tooling.

Tim Yip testified repeatedly that Super Wings has "released" all of the molds and tooling and is waiting for JLI to pick them up.[20] In fact, according to Yip, Super Wings is tired of storing the molds and tooling for JLI. Conversely, Keener testified that he has been attempting to retrieve the molds and tooling "since day one." Despite ostensibly having the same goal, the parties have been unable to effect a transfer of possession of the molds and tooling, even after their attorneys became involved.

The December 30, 2008, Agreement states that Super Wings "agree[s] to release the molds and tooling to a party authorized by [JLI] to receive same." In March 2009, Woo Hing picked up molds used to manufacture slot cars. Three or four trips were required. When the Agreement was signed, Super Wings was completing work on a

---

[20] In its Motion for Summary Judgment (docket number 34), JLI asserted that "Super Wings has continued to refuse to *return* molds and tooling as required by the Agreement." (emphasis added) At the time of trial, however, Keener conceded that Super Wings is not required to "return" the molds and tooling in the sense of providing transportation. Rather, the Agreement requires Super Wings to "release" the molds and tooling, with JLI bearing the responsibility of picking them up and transporting them.

submarine toy. After the work was completed in July 2009, both the toys and the molds were shipped directly to JLI. At about that time, Woo Hing picked up another load of molds and tooling from Super Wings.

According to Keener, JLI has made numerous additional attempts to retrieve the molds and tooling. However, JLI was unable to produce one e-mail, letter, or other document evidencing these supposed efforts. On July 6, 2009, Super Wings' solicitors in Hong Kong sent a letter to Keener, demanding payment on the promissory note. The record is silent regarding Keener's response, if any. Apparently, however, Keener did *not* respond by suggesting that the promissory note was not enforceable because Super Wings had refused to release the molds and tooling. Similarly, when Super Wings' Iowa counsel sent Keener a demand letter on July 30, 2009, Keener made no claim that Super Wings was in breach of the parties' agreement. Super Wings sued Keener on the promissory note on August 18, 2009. In his Answer filed on September 8, 2009, Keener did not claim that Super Wings had breached the Agreement. It was not until January 19, 2010 that JLI filed an application to intervene claiming, for the first time, that "Super Wings International has refused to release to J. Lloyd International and to ship to J. Lloyd International any and all molds and tools in its possession."[21] It was not until February 23, 2010, when he filed an answer to the First Amended Complaint, that Keener first asserted that the promissory note "had no consideration," because "Super Wings failed to return the tools to J. Lloyd International in consideration for the Note between Super Wings and Jody L. Keener."

In response to the petition for intervention, Super Wings' attorney wrote to JLI's attorney, asked that JLI identify any instance where Super Wings had not honored JLI's request to release the molds and tooling to an authorized recipient, and asserted that "Super Wings will arrange for release of those items." JLI's attorney responded, stating that "about 4% of the tools were released and that is all." Super Wings' attorney replied

---

[21] Keener now concedes that Super Wings has no duty to "ship" the molds and tooling to JLI.

the same day, stating that "if there were items that were not released that [JLI] wants released, Super Wings needs to know so it can release them."

Two days later, JLI's counsel responded by inaccurately portraying the substance of Super Wings' two letters. According to JLI's counsel, the first letter stated that Super Wings "have shipped everything," while the second letter states that "they do not know where to ship." JLI's attorney then advised Super Wings' attorney that Super Wings is "to ship them to the same place that they shipped the 4%." Presumably, the "4%" reference is to the molds and tooling picked up by Woo Hing. Even *if* the letter adequately identifies the party authorized by JLI to receive the molds and tooling, it does not identify specifically *what* molds and tooling are to be released. The "authorization" signed by Keener at his deposition on June 14, 2010, suffers from the same lack of specificity.

Tim Yip testified that in order to release the molds and tooling, it is necessary for JLI to provide Super Wings with a list of the specific molds and tooling which are to be picked up by the party authorized by JLI. That was the procedure followed when Woo Hing picked up molds and tooling in March and July 2009. Tom Tong, a representative of Woo Hing, testified that it is customary to have such a list, "otherwise we don't know what we are going to pick up." At the time of trial, Keener conceded that it was necessary to have a list of the molds and tooling in hand when the items are transferred from one party to another.

With the exception of the transfers in March and July 2009, JLI never provided Super Wings with a list of the molds and tooling which would be picked up by Woo Hing. Keener claims that JLI was unable to produce a comprehensive list of the molds and tooling because it was taken by Dora Yip when she parted ways with JLI. This testimony seems somewhat suspect. While Dora Yip remained in the Cedar Rapids office "off and on" for several months after the Agreement was signed, Keener apparently made no effort to obtain the list of molds and tooling. According to Keener, the computers containing the lists were subsequently sent by one of JLI's employees to Dora in California, without his

knowledge. Keener provides no explanation regarding the whereabouts of the hard-copy of the list. Furthermore, JLI was unable to produce one e-mail, letter, or other document demanding the return of the list of molds and tooling.

Even if the Court accepts Keener's testimony as true, however, it does not explain why JLI did not provide Super Wings with the lists of molds and tooling produced at trial. That is, Defendant's Exhibits J, M, T, and U, constitute more than 200 pages of molds and tooling which are apparently subject to the Agreement. For example, Exhibit T is apparently a list of the molds and tooling which were part of the assets purchased from Toy Zone, and used to manufacture the toys identified by Exhibit C of the Agreement. There is no evidence, however, that JLI sent a list of molds and tooling to Super Wings, with directions to release the items identified on the list to Woo Hing. The Court finds that Keener's claim that he repeatedly tried in good faith to retrieve the molds and tooling is not credible.[22] Absent evidence that JLI provided Super Wings with a list of the specific molds and tooling to be released, the Court cannot find that Super Wings has refused to release the molds and tooling, as required by the Agreement.

Accordingly, the Court finds that Keener has failed to prove his affirmative defense that the promissory note "had no consideration."[23] Judgment will enter in favor of Super Wings International, Ltd. and against Jody L. Keener in the amount of $2 million, plus interest at the rate of 9% per annum from and after July 1, 2009. The Court notes parenthetically that JLI may still pick up the molds and tooling by providing Super Wings with notice of the specific molds and tooling to be released, and the party authorized to receive the same.

---

[22] Keener testified that it would take "maybe 200 truck loads" to pick up all the molds and tooling. The Court suspects that JLI was not eager to incur the substantial expense of picking-up, transporting, and storing the items.

[23] While his argument is imprecise, Keener is apparently claiming a "failure of consideration," rather than a "want of consideration." *See Johnson v. Dodgen*, 451 N.W.2d 168, 172 (Iowa 1990).

### 4.   *Attorney Fees*

The promissory note executed by Keener also states that "[t]he undersigned, in case of suit on this note, agrees to pay attorney's fees." The Court concludes that Keener is required to pay those attorney fees reasonably incurred by Super Wings in obtaining judgment on the promissory note. Super Wings may file an appropriate motion pursuant to FEDERAL RULE OF CIVIL PROCEDURE 54(d)(2) and LOCAL RULE OF CIVIL PROCEDURE 54.1.a.

## B. *JLI's Claim Against Super Wings*

In its Petition of Intervention (docket number 20), JLI claims that the Agreement entered into between the parties requires Super Wings to "return" the tooling and molds to JLI. The petition of intervention asserts that "Super Wings International has refused to release to J. Lloyd International and to ship to J. Lloyd International any and all molds or tools in its possession." JLI asserts that the value of the tools is approximately $15 million and asks that judgment enter against Super Wings "in a sum that will compensate it for all of its losses and the value of the molds and tools."

JLI's claim is identical in all material respects to the affirmative defense pleaded by Keener in his defense of Super Wings' claim on the promissory note. For the reasons set forth above, the Court concludes that JLI has failed to meet its burden of proving that Super Wings has refused to release the molds and tooling in compliance with the Agreement. Accordingly, the Court finds that JLI is not entitled to judgment on its petition of intervention.[24]

---

[24] The Court notes parenthetically that even *if* JLI had proved that Super Wings had failed to release the molds and tooling as required in the Agreement, the evidence presented by JLI at trial falls far short of proving the value of the molds and tooling remaining in Super Wings' possession. Any judgment entered by the Court would be based on pure speculation.

### C. Summary

In summary, it is undisputed that Keener executed a promissory note in favor of Super Wings in the amount of $2 million, plus interest. It is also undisputed that after making initial interest-only payments, Keener has failed to pay any amount toward the principal or accruing interest. The Court concludes that Keener's affirmative defense – that the promissory note "had no consideration" – is without merit. Accordingly, judgment will enter for Super Wings in the amount of $2 million, plus interest and attorney fees.

Similarly, the Court concludes that JLI's petition of intervention is without merit. JLI failed to prove that Super Wings has refused to release the molds and tooling identified in the agreement. The Court notes parenthetically, however, that JLI may still obtain the molds and tooling by providing Super Wings with appropriate notice regarding the specific molds and tooling to be released, together with the identification of the party authorized to receive the same.

### V. ORDER

For the reasons set forth above, it is hereby **ORDERED** as follows:

1.      Judgment shall enter in favor of Super Wings International, Ltd. and against Jody L. Keener in the amount of Two Million Dollars ($2,000,000.00), plus interest at the rate of nine percent (9%) per annum from and after July 1, 2009.

2.      Super Wings shall be permitted to file a motion for attorney's fees pursuant to FEDERAL RULE OF CIVIL PROCEDURE 54(d)(2).

3.      The Petition of Intervention (docket number 20) filed by J. Lloyd International, Inc. is **DISMISSED**.

DATED this 25th day of January, 2012.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA